142 Ill. App.3d 428 (1986)
491 N.E.2d 1241
In re ESTATE OF LEON MANDEL BARR (Leon Mandel Barr, Respondent-Appellant,
v.
Linda Horwitz, Petitioner-Appellee).
No. 83-1707.
Illinois Appellate Court  First District (1st Division).
Opinion filed March 31, 1986.
Patrick T. Murphy, guardian ad litem and Cynthia R. Farenga, both of Chicago, for appellant.
*429 Robert M. Karton, Ltd., of Chicago (Robert M. Karton, of counsel), for appellee.
Affirmed in part, and reversed in part and remanded.
JUSTICE CAMPBELL delivered the opinion of the court:
Respondent, Leon Mandel Barr, appeals from an order entered by the circuit court, probate division, adjudicating him a disabled person and appointing his sister, Linda Horwitz, plenary guardian of his person and estate pursuant to sections 11a-2 and 11a-3 of the Probate Act of 1975 (the Act) (Ill. Rev. Stat. 1983, ch. 110 1/2, pars. 11a-2, 11a-3). On appeal, respondent contends that: (1) the trial court's adjudication of disability is contrary to the manifest weight of the evidence; and (2) in the alternative, if guardianship is warranted, plenary guardianship of the estate and person is overbroad and violates the purpose of the Act.
The record reveals the following facts pertinent to this appeal. On January 17, 1983, petitioner, Linda Horwitz, filed a petition pursuant to the Act to have respondent adjudged a disabled person due to mental illness and to be appointed guardian over his person and estate. Pursuant to section 11a-10 of the Act (Ill. Rev. Stat. 1983, ch. 110 1/2, par. 11a-10), the court appointed a guardian ad litem to represent the interests of respondent. Following an interview with respondent, the guardian ad litem filed a report with the court, advising the court that respondent intended to present a defense to the petition. Thereafter, upon respondent's request, the court appointed the guardian ad litem as legal counsel for respondent.
At the guardianship hearing held on May 4, 1983, respondent, age 44, testified under adverse examination by counsel for petitioner that he has resided at The Evanston-Ridgeview, a type of halfway house in Evanston, since September 13, 1982. Prior to that time, he had lived with a roommate in Chicago for approximately 15 years until he was asked to leave because he no longer had any money with which to pay his share of the expenses. As of September 1982, respondent owed his roommate approximately $3,500.
Respondent further stated that, with the exception of a few odd jobs from time to time, he has been unemployed for the last four years. His last employment had been as a new car salesman which lasted approximately two weeks. Prior to the salesman position, he had worked for a film processing company for about one year, and for an auto parts distributorship for one year. Respondent further testified that he had a pending job offer to work for a retail tile store in Niles as a store manager. The only reason he has not accepted the offer is because he does not have enough money to pay for transportation. When queried about *430 the details of the job offer, respondent admitted that he had never personally met with anyone at the store, but had had several telephone conversations with the management.
Respondent denied that he was mentally ill and claimed that his sister was trying to "railroad" him so that she could take the entire estate of their father, who had died in March 1982. Under his father's will, both respondent and petitioner are co-executors of the estate and are to divide the estate, valued at approximately $100,000, equally. Respondent further explained that when his mother had died in the early '70's, she had left petitioner and respondent equal shares of stock in a company owned by their uncles. When respondent received his portion of the shares in the company, he sold them back to the company for $30,000. Respondent admitted that he was bitter about the way in which his uncles had treated his mother and the fact that they had never offered him a job with the company. Between 1975 and 1977, respondent had written several letters to one of his uncles and a cousin expressing these feelings. At one point during that period, he even wrote a letter to The Wall Street Journal, informing the paper that he was contemplating a lawsuit against his uncles' company. No lawsuit was ever filed.
Respondent further stated that during the last few years of his father's life, his father had given him $25 per week for expenses. After his father's death, petitioner gave him a similar amount until he moved into The Evanston-Ridgeview.
Next, Dr. Paul R. Cekan, psychiatrist, testified on behalf of petitioner that pursuant to his contract with The Evanston-Ridgeview, he conducted a routine psychiatric evaluation of respondent in September 1982. The initial visit lasted approximately one hour. Thereafter, Dr. Cekan saw respondent four more times on an average of four minutes per meeting. Based upon these meetings and discussions with respondent's family and members of The Evanston-Ridgeview staff, Dr. Cekan diagnosed respondent as suffering from chronic undifferentiated schizophrenia. Specifically, Dr. Cekan stated that although respondent had no severe physical problems and was capable of directing himself and caring for his immediate needs, he was "chronically hostile and uncooperative" and showed "delusions of persecution, poor insight and judgment." Dr. Cekan further opined that respondent was not capable of making good financial decisions regarding large sums of money, but could manage pocket money. In conclusion, Dr. Cekan recommended that respondent be maintained as a disabled person in a halfway house setting such as The Evanston-Ridgeview.
Petitioner then testified that during the last year of her father's *431 life, she personally gave respondent $25 per week because her father was too ill to take care of his own financial affairs. After her father's death, she decided to stop giving money to respondent. When the funding ceased, respondent became extremely angry and, on one occasion, raised an umbrella at petitioner's husband when her husband refused to give respondent any money.
Petitioner further testified that in September 1982, while she was out shopping, respondent moved into her house in Evanston with a suitcase and some personal belongings. Approximately one week earlier, respondent had telephoned her to say he had been asked to leave his apartment and planned to move in with her family. At that time, she told him that it was not possible. However, one week later, he attempted to move in, claiming that he was entitled to stay. After calling a psychiatrist friend and the Evanston police, petitioner paid for respondent to stay that night at a nearby Holiday Inn. The following day, she made arrangements for him to move temporarily to the Evanston YMCA at her expense. Petitioner then arranged for respondent to move into The Evanston-Ridgeview, and has been giving the staff $7 per week to distribute to respondent as spending money.
Following petitioner's testimony, respondent's motion to dismiss the petition on the grounds that petitioner had failed to make a prima facie case and to meet the burden of clear and convincing evidence was denied.
Next, Dr. Harry Whitely, psychiatrist, testified on behalf of respondent that he had examined respondent once for approximately one hour and a second time just prior to the hearing. In Dr. Whitely's opinion, there was no evidence of a mental disorder or schizophrenia and respondent's intellectual functioning was well above average. However, Dr. Whitely did observe that respondent was nervous and defensive about his employment. Based upon his observations, Dr. Whitely concluded that respondent was: (1) a dependent person who was embarrassed about not being more independent; (2) capable of managing his personal and financial affairs; and (3) capable of taking care of himself, although perhaps not according to the standards of others. Dr. Whitely further opined that it would be detrimental to respondent's mental health if he were relieved of all responsibilities.
Respondent then testified that his assets consist solely of 11 lots of undeveloped recreational property in Arizona which he had purchased in 1965 and had paid for in installments over a period of 12 years. He has no checking or savings accounts because he has no money. Respondent further stated that he is not certain what he will do with his one-half of his father's estate. He thought he would either leave the *432 money where it is or invest it in something like the citrus grove he had owned in the early '70's. Respondent indicated that he understood that there were different types of financial institutions which offered various interest rates.
Regarding prospective employment, respondent stated that his most recent discussion with the tile store regarding his management position had taken place several weeks ago. In addition, he had a vending machine distributorship "already set up." However, on cross-examination, he revealed that he did not actually have either equipment or employees ready for his new vending machine venture. With respect to his father's will, respondent explained that he had been hesitant to sign any papers given to him by his sister the previous August because he had not yet talked to a lawyer. As a result, he tore up the papers she had given him. Respondent saw the will for the first time a few weeks before the hearing when he filed it in probate. His sister had made no interim attempt to file the will. Respondent further stated that because he did not feel that he would be able to communicate with petitioner, he would prefer having someone else appointed as guardian if such an appointment were deemed necessary by the court.
Thereafter, during respondent's closing argument, he requested the court "to consider something less than plenary guardianship." In this regard, respondent argued that, if the court were to reach a determination of the need of some adjudication of disability, the statute regarding that guardianship should be utilized only as is necessary to promote the well-being of the disabled person, to encourage development of his maximum self-reliance and independence.
Following closing arguments, the court found that respondent was mentally sick, disabled and "not capable of making responsible decisions concerning his person and his estate." Accordingly, respondent was adjudicated disabled and petitioner was appointed plenary guardian of respondent's person and estate. Respondent's timely appeal followed.
Respondent contends that the trial court's decision to adjudicate him a disabled person is contrary to the manifest weight of the evidence. In the alternative, if guardianship is found to be warranted, respondent argues that plenary guardianship of the estate and person is overbroad and violates the Act's mandate to maximize self-reliance and independence.
 1 Pursuant to section 11a-2 of the Act (Ill. Rev. Stat. 1983, ch. 110 1/2, par. 11a-2), a "disabled" person is one who is "18 years or older who * * * is mentally ill or developmentally disabled and who because of his mental illness or developmental disability is not fully able *433 to manage his person or estate." The adjudication of disability is a uniquely factual question which is to be made by the trial court and will not be disturbed upon review unless the trial court's findings are contrary to the manifest weight of the evidence. In re Estate of Galvin (1983), 112 Ill. App.3d 677, 445 N.E.2d 1223; In re Estate of Malloy (1981), 96 Ill. App.3d 1020, 422 N.E.2d 76.
Once a determination of disability has been made, section 11a-3(a) of the Act (Ill. Rev. Stat. 1983, ch. 110 1/2, par. 11a-3(a)) provides that "the court * * * may appoint (1) a guardian of his person, if because of his disability he lacks sufficient understanding or capacity to make or communicate responsible decisions concerning the care of his person, or (2) a guardian of his estate, if because of his disability he is unable to manage his estate or financial affairs or (3) a guardian of his person and of his estate." Further, in the case of partial incapacity, the court may appoint a limited guardian of the respondent's person, estate, or both. (Ill. Rev. Stat. 1983, ch. 110 1/2, par. 11a-12(c).) In reaching its determination as to the appointment of a guardian, courts are to impose guardianship "only to the extent necessitated by the individual's actual mental, physical and adaptive limitations." Ill. Rev. Stat. 1983, ch. 110 1/2, par. 11a-3(b).
In the case at bar, the trial court heard the testimony of two expert witnesses as to the psychiatric condition of respondent, as well as the testimony of petitioner and respondent. As generally occurs when each side presents an expert witness, the experts disagreed in their diagnoses. In the opinion of Dr. Cekan, petitioner's expert, respondent suffered from disabling chronic undifferentiated schizophrenia and should remain in a halfway house setting. However, Dr. Cekan also stated that respondent was capable of directing himself and caring for his immediate needs, and could manage pocket money. In the opinion of Dr. Whitely, respondent's expert, there was no evidence that respondent suffered from a disabling mental illness. Respondent testified that until his father's death approximately one year prior to the proceedings, he had been able to care for himself with minimal financial assistance from his family. Further, he was in good health, was aware of his surroundings, and had made repeated efforts to secure employment. With respect to his finances, respondent demonstrated a basic understanding of banking procedures, but had not invested the $30,000 he had received from the sale of his mother's stock in the early '70's. Rather, he had used the money to complete the payments on his Arizona property and for his day-to-day living expenses until 1979, at which point he had spent all of his money.
 2 Based upon the foregoing evidence, we find that the trial *434 court's adjudication of disability was not contrary to the manifest weight of the evidence. However, we do not find that the evidence supports the trial court's appointment of plenary guardian over respondent's person and estate. With respect to guardianship over respondent's person, we agree that the evidence demonstrates that respondent has some mental peculiarities and has selected a lifestyle that could easily be described as eccentric. Nevertheless, we cannot say that these eccentricities render respondent unable to manage his person. With the exception of seeking minimal financial assistance from his family when his inheritance had been spent, and seeking shelter from his sister when he was evicted from his home of 15 years, respondent has been self-sufficient and has not presented a danger to himself or to the community. Therefore, we reverse the trial court's order appointing a guardian over respondent's person.
 3 With respect to guardianship over respondent's estate, we find that the evidence clearly demonstrates that respondent has been improvident in managing his financial affairs. However, in our opinion, the evidence does not indicate that respondent lacks all capacity to understand or manage his day-to-day financial needs. Accordingly, we conclude that the trial court's order appointing a plenary guardian over respondent's estate is to be modified so as to appoint a limited guardian over respondent's estate, restricted to the investment of respondent's portion of his father's estate in such a manner so as to maximize respondent's self-reliance and independence.
Finally, we find no abuse of discretion in the selection and appointment by the circuit court of petitioner as guardian. There is no evidence in the record of any self-serving motives on petitioner's part to care for her brother. (See In re Estate of Bania (1984), 130 Ill. App.3d 36, 473 N.E.2d 489.) To the contrary, the evidence clearly indicates that petitioner's actions have been motivated by concern for her brother's welfare. In addition, we find that petitioner would have ample time and ability to fulfill the duties of a limited guardian.
For the following reasons, we affirm the circuit court's adjudication of disability; reverse its order appointing a guardian over respondent's person; and remand the cause to the circuit court with instructions to enter the appropriate order regarding the appointment of a limited guardian over respondent's estate consistent with the views expressed herein.
Affirmed in part; reversed in part; and remanded with instructions.
O'CONNOR and QUINLAN, JJ., concur.