_In re_ ESTATE OF DOROTHY L. HICKMAN, a Disabled Person (Dorothy M. Jones _et al._, Temporary Guardians of the Estate of Dorothy L. Hickman, a Disabled Person, Petitioners-Appellants, v. Dorothy L. Hickman, Respondent-Appellant (Palmer American National Bank, Plenary Guardian of the Estate of Dorothy L. Hickman, a Disabled Person, Respondent-Appellee; John T. White, Intervenor)).

Fourth District   No. 4—90—0572

Opinion filed January 31, 1991.

William A. Young, of Young & Young, of Danville, for appellants.

Kenneth R. Watson, of Williamsport, Indiana, for appellee.

Mark S. Goodwin, of Dougherty, Hofmann & Goodwin, of Danville, guardian *ad litem*.

PRESIDING JUSTICE LUND delivered the opinion of the court:

Petitioners Dorothy Jones and James Burton appeal from the portion of the order of the circuit court of Vermilion County denying their petition to appoint a personal guardian for their aunt, the respondent. We affirm in part and reverse in part.

On December 26, 1989, petitioners filed a petition seeking the appointment of a guardian of the person and estate of the respondent. The court entered an order appointing petitioners temporary guardians of respondent's person and estate. Respondent subsequently filed a counterpetition requesting the appointment of the Palmer Bank of Danville as her estate guardian.

An evidentiary hearing was held on February 28, 1990. Larry Kaufmann, a tenant farmer of respondent's farmland in Cissna Park, Illinois, testified that in the past year he has sent the respondent at least two statements for expenses incurred. Respondent told him that she never received the statements and asked Kaufmann to help her locate them. While looking through respondent's papers, Kaufmann found a payment-in-kind certificate issued by the Agricultural Stabilization and Conservation Service (ASCS) which had expired. Kaufmann also found a delinquency notice for unpaid property taxes and an unpaid fertilizer bill. Kaufmann additionally recalled being informed that the grain elevator had sent respondent a check for $10,000 to $12,000 for grain sold in March, which respondent did not cash for several months. Respondent asked Kaufmann to help her with the bills because her deceased husband took care of such things

and she was unfamiliar with them.

Debra Jean Burton, a cosmetologist who is married to the respondent's nephew, testified that the respondent visited her beauty shop in December 1989. When the respondent arrived, Dorothy Jones, respondent's niece, was also there receiving a permanent. Respondent did not recognize Jones and told her that she had a sister who looked just like her. Debra Jean stated that respondent smelled like she had not bathed recently. When she shampooed respondent's hair, Burton had to "wash in behind her ears to get the cakiness behind her ears." After Debra Jean finished the permanent, she and the respondent went to lunch. Although respondent had paid for her permanent at the beauty shop, she attempted to pay Debra Jean two more times during lunch. When respondent opened her purse to pay for lunch, Debra Jean noticed that respondent had taken items from the table, including the salt and pepper shakers.

Debra Jean's husband James was appointed respondent's temporary guardian. Since this appointment, Debra Jean has helped to pay respondent's bills for her. She stated that the respondent had a 1988 radiology bill that had not been paid and a telephone bill that had not been paid for two months.

Clarence Burton, the respondent's brother-in-law, described himself as a "tax man." He stated that the respondent, who has had difficulty "keeping her bills paid," asked him to assist her. In November 1989, he found numerous overdue bills in respondent's home, as well as an uncashed check for $12,093.99 for grain which had been sold in early March. Clarence also stated that when he prepared respondent's 1988 income tax returns, he had to apply for an extension because respondent kept no records. Clarence concluded that respondent is unable to manage her own financial affairs.

Lucille Conway, respondent's sister-in-law, testified that she has known respondent for approximately 50 years. Conway stated that in the past year respondent would sometimes call her four or five times in one day, continually contradicting herself and forgetting that she had called previously.

Dorothy Jones, respondent's niece and copetitioner in this action, testified that she lived with the respondent until age 12 and thereafter spent weekends and summers with her. Jones stated that respondent drove her car without insurance or a valid driver's license until she took respondent's car and put it in storage at her home. Jones has three daughters, two of whom respondent does not recognize. Respondent recognizes one of Jones' daughters "once in awhile." The last time respondent attempted to visit Jones' home, she got lost.

Jones also described the condition of respondent's health. She stated that respondent has a pacemaker and must take medication and wear a nitroglycerine patch every day. Jones added that respondent will refill her medication, "but she never takes it." She later noted that respondent was once hospitalized for failing to take her heart medication. Jones also stated that respondent has to be taken to the hospital three or four times a year for chest pains.

When asked about respondent's eating habits, Jones explained that respondent no longer cooks at home and does not eat properly. She goes out to eat when she is hungry. Jones also described respondent's home at 110 Urban Drive in Westville. She said there is a big ball of bird seed on respondent's dining room table. There are bugs in the bird seed. The respondent's bird flies freely, and its droppings are all over the house.

James Burton, copetitioner in this case and nephew of the respondent, testified that he resided with the respondent from the time he was 13 months old until he reached 12 or 13 years of age. He also lived with the respondent and his uncle in Florida for approximately three years. James stated that the respondent is very forgetful. She locks herself out of her home and calls his home frequently, often repeating what she had just said in a prior call.

Respondent testified she is 80 years old, that no medication has been prescribed by her doctor, and that she has not been to a doctor for a long while. She stated she has not seen Dr. Alnaqib, her physician, for several years. When asked when she was last in the hospital, she responded "three or four months or something like that." When asked whether she saw a doctor while she was in the hospital, she replied that she saw Dr. Alnaqib. Although respondent recalled that Dr. Alnaqib prescribed medication during her last visit to the hospital, she could not recall what he prescribed.

Counsel questioned the respondent about her relationship with John White. Respondent stated she was a housekeeper for White. She explained that she lived in Indiana with White part of the time because she did not want to be home. Respondent told her sister-in-law that she was married to White in order to avoid criticism.

Counsel then questioned the respondent regarding her personal and financial affairs. Respondent stated she had money in the Palmer and Cissna Park banks, although she did not know how much money was in either account. She said she has an automobile, but does not drive it. She explained that she does not have a driver's license or insurance and that the car is now at Dorothy Jones' house. Counsel also asked respondent if she remembered receiving a check for $12,093 for

her crops last year. Respondent replied that she still has the check in her lock box at the Palmer Bank. When questioned about her farmland, respondent stated that she owns 110 acres of farmland in Cissna Park, Illinois, which is farmed by Larry Kaufmann. When asked about the petitioners Dorothy Jones and Jim Burton, respondent stated that she helped raise them. She said "Jimmy" lived with her and her now deceased husband until he was two or three years old, and that Dorothy lived with her until she was about five or six. Respondent further explained that she does not do any cooking at home and eats her meals out.

Counsel asked respondent whether she knew Jean Burton. Respondent replied that Jean is married to her nephew and is a beautician by trade. Although respondent admitted that she needs someone to take care of her financial affairs, she contended that she is capable of feeding, clothing, and bathing herself, as well as taking care of household chores. At the conclusion of respondent's testimony, the court ordered an independent evaluation of the respondent by a physician and continued the matter until the results of the evaluation would become available.

Respondent and John White were married on March 5, 1990. White subsequently requested and was granted permission to intervene in the proceedings. White also filed a petition to terminate the temporary guardianship of his spouse.

The court heard additional testimony on May 22, 1990. Dr. Suhail Alnaqib, a physician specializing in internal medicine and gastroenterology, testified that the respondent has been his patient for approximately 10 years. He used to see respondent on a regular basis but, in later years, her visits have been infrequent. From 1987 through 1989, he saw the respondent nine times. On August 14, 1989, respondent was admitted to the hospital through the emergency room with chest pain. Alnaqib stated that during her stay at the hospital, respondent "had periods of confusion and disorientation, and her memory was not adequate." During this visit, Alnaqib advised that respondent would "need to be supervised on an almost continuous basis." Alnaqib again saw respondent in March 1990, when she was admitted to a psychiatric wing. He observed that although she was "quiet" and "very pleasant," her memory was still impaired. He concluded that respondent's "memory has been failing her progressively." Alnaqib added that, "my record [indicates] lack of compliance with treatment, and in retrospect I find out that this is really something related to her memory rather than her intention not to take medication."

A report submitted by Alnaqib states that respondent is totally in-

capable of making personal and financial decisions due to disorientation and impaired memory.

Faye Scripter, an acquaintance of the respondent for the last 8 to 10 years, testified that the petitioners brought the respondent to her home on Merrill Street in Catlin on March 19, 1990, so that Scripter could take care of her. Scripter observed that the respondent was not clean and smelled badly. She removed respondent's coat from her home because it "smelled terrible." Respondent's underwear was so dirty that Scripter burned it. She put respondent in the bathtub. Respondent emerged from the bathroom wearing the same dirty clothes she had on when she arrived. Scripter noticed that respondent had not washed her head. When respondent prepared for bed, Scripter put her dirty clothes in the washing machine.

During dinner that evening, respondent spoke to Scripter and her husband. Scripter stated that "she would talk for 15 minutes maybe her mind was pretty good; and then it would go where she wasn't talking sensible. But as long as she kept her mind just on that, why, she did real good."

At approximately 2:30 a.m., Scripter heard respondent moving in her bedroom. Respondent, who was in the closet, asked Scripter whether the clothes in the closet were hers. As Scripter explained that the petitioners brought some clothes for her to wear, she noticed that respondent had just put on make up. Respondent told Scripter that she always likes to look nice. At approximately 6:30 a.m., Scripter found respondent in her kitchen trying to make a phone call. After Scripter told respondent that she was not supposed to use the phone, respondent returned to her bedroom. Respondent later ran out of Scripter's home to a neighbor's house. Scripter then called the police.

Frederick Reddy, chief of the Catlin police department, responded to a call regarding a mental subject in a house on Merrill Street on March 20, 1990. Reddy, who has known the respondent for approximately 35 years, transported her to an emergency room "due to her mental state." Respondent told Reddy that she had been held against her will. Reddy stated that, "[s]he appeared to be very confused as to where she was at as well as what was going on around her or why she was even at that location." He remained with the respondent while she waited for a doctor to examine her. Reddy asked the respondent if she was married, and she replied that she thought she was, although she could not tell him where or when she was married or if she was married by a preacher or a judge.

William Blue, a friend of John White, respondent's husband,

stated that he has been with the respondent and White on numerous occasions since he first met respondent in July 1989. Blue described White's home as "about as clean as they can keep it." He stated he has observed the respondent "wash" dishes by wiping them off with a paper towel and putting them on the shelf. When asked about respondent's condition, Blue stated, "When she's nervous, she's kind of off—you have to repeat twice to her to let her know what's going on." He also stated that respondent "should have a woman with her to kind of see after her, give her medicine and stuff that she needs."

Lucille Conway, respondent's sister-in-law, described the house in Coal Hollow, Indiana, where the respondent resided with John White. On May 10, 1989, Conway visited the home at approximately 10:30 a.m. John White had moved out, and the house was furnished only with a few chairs, a couch, and a coffee table. There was no stove, refrigerator, bed, fan, or air conditioner in the house. Conway recalled it was an 85-or 90-degree day. Respondent had closed all the windows and doors. Although respondent had not eaten that day, she drank a can of warm beer from the cupboard. The respondent appeared unclean and kept repeating herself. Conway stated that respondent was unable to make necessary decisions regarding her personal care and hygiene.

James Burton, respondent's nephew and copetitioner in this case, described petitioners' exhibit Nos. 3 through 24, which are pictures of respondent's home in Westville, Illinois. All the pictures are dated April 28, 1990. Exhibit No. 3 is a photograph of the northwest bedroom of respondent's home. A pile of stuffed toys reaches almost to the ceiling. Exhibit Nos. 5 and 6 depict a garbage bag full of empty beer cans and a bucket containing empty liquor bottles, which James stated he found in respondent's home. Exhibit Nos. 8 and 9 are pictures of respondent's bathtub and toilet, both of which contain dark rings. Exhibit No. 10 is a picture of respondent's southeast bedroom, which contains stacks of boxes and old clothes. Exhibit No. 12 is a picture of respondent's parakeet lying dead on the floor of her front room. Exhibit No. 13 is a picture of respondent's kitchen table. The table contains a bowl of birdseed and is littered with birdseed and bird droppings. James testified that respondent always kept an immaculate house when he resided with her.

James then described respondent's behavior during a period of hospitalization from March 20 to March 30, 1990. During her first day at the hospital, respondent told James that she had been there for four days and had not seen a doctor. Respondent thought she was at a "mission" rather than a hospital. The next day, respondent told him

that she had been there for nine days.

Respondent testified that she resides in West Lebanon, Indiana, and owns a home at 110 Urban Drive in Westville, Illinois. She stated that she was single when she last testified, but is now married. When asked her age, respondent said that she is 71 years old and was born in 1910. Counsel asked respondent if she was related to James Burton and Dorothy Jones. She replied that they are her nephew and niece, and that they lived with her and her husband when they were children. Respondent was shown petitioners' exhibit No. 24, a photograph of her Westville home, which she properly identified. She recognized all of petitioners' pictures of the Westville home which were shown to her, and she identified every room in the house. When questioned about her bird, she responded, "Someone's taking care of him." Respondent did not recall leaving a large bag of beer cans and two empty liquor bottles in her home.

Dr. Buymong Lee, a psychiatrist, examined the respondent on March 20, 1990. Lee stated that when respondent entered the hospital, she was grossly confused and disoriented. He also stated that respondent's memory was noticeably impaired and that "she wasn't quite aware [of] her immediate surroundings and the reason why she was in the hospital." The next day, Lee asked the respondent how long she had been in the hospital, and she answered "two or three weeks." By March 22, 1990, Lee observed no noticeable change in respondent's condition. He began to administer small doses of the antipsychotic medication Navane. Respondent's overall condition improved by March 27. On March 30, 1990, respondent was discharged. On that date, Lee observed no gross confusion or agitation, and noted an improvement in respondent's sleeping and appetite. Although respondent's mood was stable, her memory remained impaired. Lee diagnosed respondent as having "organic mental disorder/dementia" and coronary artery disease.

During his testimony, Lee was shown a letter from a Dr. Fabrizio, which stated that respondent has "organic brain syndrome, Alzheimer's disease." The letter stated that "this is only likely to become worse." Lee agreed with Dr. Fabrizio's diagnosis and concluded that respondent is incapable of taking care of her basic needs.

A report submitted to the court by Lee notes that respondent suffers from impaired memory, judgment, and self-care ability, and states that respondent is totally incapable of making personal and financial decisions.

The letter from Dr. Fabrizio to which Dr. Lee referred is dated March 28, 1990, and is addressed to the trial court judge who pre-

sided over this case. The letterhead indicates that Fabrizio is a physician specializing in cardiology and internal medicine. The letter states that physically, the respondent appears to be "quite well" and notes that her heart function appears to be "remarkably good." With regard to respondent's neurological function, Fabrizio wrote that "the patient is disoriented as to time and date and has absolutely no recall for manipulation of simple numbers." He also observed that respondent has "no idea she takes any medications" and "no recall of why her cardiac pacemaker was implanted." Fabrizio concluded that the "management of an estate with financial decisions" and even day-to-day accounting "is and will become impossible" for the respondent. Although Fabrizio recommended that respondent's interests would be "best served by a guardian," he made no statement regarding her ability to take care of her person on a day-to-day basis. Fabrizio advised consultation with Dr. Tazudeen, a neurologist.

Phyllis Cadle, who lives across the street from the Scripter residence, testified that respondent knocked on her door at approximately 6:15 a.m. on March 20, 1990, and asked her if she could use her phone to call her husband. Respondent informed Cadle that the people across the street were trying to say that she was incompetent. She told Cadle her name, her husband's name, and where she lived, but said, "I'm so nervous I can't remember the number." After receiving John White's phone number from directory assistance, Cadle called him and asked him to pick up his wife. The chief of the Catlin police department came to Cadle's home and left with the respondent before John White arrived. Cadle stated that respondent appeared "nervous."

On May 31, 1990, respondent filed a motion to withdraw her counterpetition, contending that she did not desire a guardian of her person or estate.

The court heard further testimony on June 11, 1990. Respondent again identified the location of her farm, as well as her current residence and her home in Westville, Illinois. She stated that she was married to Carl Hickman for 52 years, until he passed away approximately eight years ago. She also described her relationship to the petitioners. When questioned about her bank accounts, respondent stated that she has money at the Palmer, Catlin, Westville, and Cissna Park banks, although she did not know the amounts in each account. Respondent additionally stated that she withdrew her prior request to have the Palmer Bank appointed guardian of her estate.

Respondent was again shown petitioners' exhibit No. 6 and asked if she ever had beer, vodka, or whiskey in her house in Westville. She

stated there was some beer and a bottle of liquor in the house, but it was not hers. She explained that she has not been in her home in Westville since Christmas. Respondent was then asked the year and date, and she stated it was 1989. Respondent did not know the precise date or why she was in court. She did, however, recall the testimony of her sister-in-law, Lucille Conway, regarding her home in Coal Hollow, Indiana. Respondent stated she was not living alone, and that her home was furnished when Conway visited her. Respondent explained that she and her husband moved out of the house because of her husband's "respiratory trouble." She now lives in her husband's home in West Lebanon, Indiana. When questioned about her age, she replied that she is 70 years old and was born in 1910.

An inventory of respondent's assets filed on May 22, 1990, reveals that respondent has deposits at the First National Bank of Catlin, the Palmer American National Bank, and the Cissna Park State Bank, with a total value of over $314,000. The inventory makes no mention of an account at the Westville bank.

Dr. Vathiar Tazudeen, a neurologist, testified that he first saw the respondent on May 16, 1990, and has seen her approximately three times in the last three weeks. Tazudeen stated that the respondent has "a very mild early type of dementing process, memory impairment." A CAT scan ordered by Tazudeen revealed no serious problem except mild atrophy of the brain. A brain-wave test, as well as a check on the circulation to respondent's brain, produced normal results. Tazudeen sent respondent to Indiana University for further evaluation of her memory functions.

Dr. Hendrie, the director of the center for Alzheimer's disease and related disorders, wrote Tazudeen a letter informing him that respondent scored a 20 out of 30 in the minimum-mental-state examination. Hendrie advised Tazudeen that a score of 24 or more would be considered normal, and characterized respondent's score as "a mild dementing range." Hendrie concluded that respondent suffered from early Alzheimer's disease. Tazudeen agreed that respondent could be suffering from mild Alzheimer's disease. He stated that respondent "still has a lot of faculties intact" and is able to care for herself in the activities of daily living. Tazudeen added that respondent need not be taken from her home environment and placed in a nursing home for ongoing care.

On cross-examination, Tazudeen stated that if he had known that respondent was not able to maintain her cleanliness, he might have changed his diagnosis.

John White, respondent's husband, testified that he and the re-

spondent have not been to respondent's Westville home in two or three months. He stated that the locks had been changed and they could not get in. White also described his home life with the respondent. He explained that respondent does the cooking, both he and the respondent clean the house, and White's daughter does their laundry. In regard to the respondent's health, White stated that she has not had any heart trouble in the years he has known her. White admitted that respondent takes medication, although he does not know its name or what it is for. When questioned regarding respondent's Coal Hollow, Indiana, home, White stated that he never left her there alone.

The trial court adopted the recommendation of the guardian *ad litem*, and entered an order denying the petition to appoint a guardian of respondent's person and granting the petition to appoint a guardian of respondent's estate. The court found that respondent's memory impairment and dementia make her incapable of managing her estate and financial affairs, but do not render her unable to make or communicate responsible decisions concerning the care of her person.

On appeal, petitioners contend that the trial court erred in refusing to appoint a personal guardian for respondent. We agree. Sections 11a—2 and 11a—3 of the Probate Act of 1975 (Ill. Rev. Stat. 1989, ch. 110½, pars. 11a—2, 11a—3) set forth the standards for determining whether a guardian may be appointed for an individual and provide, in relevant part, as follows:

> " 'Disabled person' defined. 'Disabled person' means a person 18 years or older who (a) because of mental deterioration or physical incapacity is not fully able to manage his person or estate, or (b) is mentally ill or developmentally disabled and who because of his mental illness or developmental disability is not fully able to manage his person or estate, or (c) because of gambling, idleness, debauchery or excessive use of intoxicants or drugs, so spends or wastes his estate as to expose himself or his family to want or suffering." Ill. Rev. Stat. 1989, ch. 110½, par. 11a—2.

> "Adjudication of disability—Power to appoint guardian. (a) Upon the filing of a petition by a reputable person or by the alleged disabled person himself or on its own motion, the court may adjudge a person to be a disabled person and may appoint (1) a guardian of his person, if because of his disability he lacks sufficient understanding or capacity to make or communicate responsible decisions concerning the care of his person ***.

(b) Guardianship shall be utilized only as is necessary to promote the well-being of the disabled person, to protect him from neglect, exploitation, or abuse, and to encourage development of his maximum self-reliance and independence. Guardianship shall be ordered only to the extent necessitated by the individual's actual mental, physical and adaptive limitations." Ill. Rev. Stat. 1989, ch. 110½, par. 11a—3.

The foregoing provisions indicate that although a person may be disabled in the statutory sense of not being fully able to manage her person, a guardian is not permissible or appropriate if that person is capable of making and communicating responsible decisions concerning the care of her person. (*In re Estate of Galvin* (1983), 112 Ill. App. 3d 677, 681, 445 N.E.2d 1223, 1225; *In re Estate of Mackey* (1980), 85 Ill. App. 3d 235, 238, 406 N.E.2d 226, 229-30.) We recognize that the adjudication of disability is a uniquely factual determination which is to be made by the trial court and is not to be disturbed upon review unless the trial court's findings are against the manifest weight of the evidence. (*In re Estate of Barr* (1986), 142 Ill. App. 3d 428, 433, 491 N.E.2d 1241, 1245; *Galvin*, 112 Ill. App. 3d at 681-82, 445 N.E.2d at 1225-26.) However, after careful review of the record, we conclude that the trial court's finding that respondent has the capacity to make or communicate responsible decisions concerning the care of her person is against the manifest weight of the evidence.

■ The evidence strongly indicates that respondent suffers from an impaired memory and is prone to confusion and disorientation. On at least one occasion, respondent was uncertain why she was in court. On more than one occasion, she was not certain of her age. Without being reminded, she appears to have no independent knowledge of her medical condition or history. The testimony of numerous witnesses indicates that respondent is unable to make personal grooming decisions in a manner which would assure good health. This evidence is particularly disturbing in light of the fact that respondent is an elderly woman with a heart condition who wears a pacemaker and must take medication regularly.

Perhaps the most convincing evidence indicating respondent's need for a personal guardian comes from the physicians who have examined her. Of the four physicians who provided opinions to the court on respondent's ability to make responsible decisions concerning the care of her person and estate, only Dr. Tazudeen stated that respondent is capable of caring for herself. Tazudeen, who saw the respondent only three times, admitted that he was unaware that respondent was having difficulty maintaining her finances and personal hygiene.

He stated that he might have changed his diagnosis had he known that respondent was unable to maintain her cleanliness.

Dr. Alnaqib, respondent's primary physician for the last 10 years, has examined respondent on numerous occasions in the last three years. He stated that respondent has a history of lack of compliance with treatment due to progressive memory failure. He concluded that respondent is totally incapable of making personal and financial decisions.

Dr. Lee, a psychiatrist who had the opportunity to observe respondent continually over a 10-day period of hospitalization, also concluded that respondent's impaired memory and judgment render her totally incapable of making personal and financial decisions.

While Dr. Fabrizio's report to the trial court states that management of an estate is "impossible" for the respondent, the report does not advance an opinion on respondent's ability to make decisions concerning her personal care. However, Fabrizio's observation that respondent "has no idea she takes any medications" and "no recall of why her cardiac pacemaker was implanted" suggests that responsible health-care decisions would be equally impossible for the respondent.

In light of the evidence adduced at trial, we conclude the trial court's finding that respondent does not require a personal guardian was against the manifest weight of the evidence. Accordingly, we reverse the portion of the trial court's order denying petitioners' request to appoint a personal guardian and remand the cause for the appointment of a personal guardian for the respondent. The portion of the trial court's order appointing a guardian for respondent's estate is affirmed.

Affirmed in part; reversed in part and remanded.

GREEN and STEIGMANN, JJ., concur.