*In re* GUARDIANSHIP OF DOROTHY AUSTIN *et al.* (The People of the State of Illinois, Petitioner-Appellee, v. Dorothy Austin *et al.*, Respondents-Appellants).

Fourth District No. 4—92—0641

Argued March 24, 1993.—Opinion filed June 10, 1993.

James B. Moses, Jr., of Guardianship & Advocacy Commission, of Peoria, and William Sheidemantel (argued), of Guardianship & Advocacy Commission, of Decatur, for appellants.

No brief filed for the People.

Patrick O'Brien, of Eureka, guardian *ad litem.*

PRESIDING JUSTICE STEIGMANN delivered the opinion of the court:

The Office of State Guardian (OSG) appeals from guardianship orders entered for 14 persons, 10 of the orders naming OSG as limited guardian of the person and estate, and four naming family members as limited guardians of the person and estate. OSG contests (1) the limitations placed upon the guardians' authority to consent to certain medical and placement decisions, and (2) the inclusion within the orders of the appointment of guardians of the estate. We affirm the 10 guardianship orders naming OSG as limited guardian of the person and estate and dismiss the appeals involving the four respondents for whom family members were appointed as guardians.

I. BACKGROUND

On March 20, 1992, OSG filed petitions for the appointment of temporary guardians and "For Appointment of Limited Guardians of the Person and Plenary Guardian of the Estate" of 14 allegedly disabled persons (hereinafter referred to as wards) (see Ill. Rev. Stat. 1991, ch. 110½, par. 11a—2) who all then resided at Elmwood Manor, an unlicensed room and board facility in Woodford County scheduled to close on April 1, 1992. By the time of the first hearings, held on April 30 and May 4, 1992, all the wards had been transferred to other residential facilities and the temporary guardianship petitions became moot.

In its petitions for limited guardianship, OSG alleged that each respondent was a disabled person incapable of managing her own per-

son and estate as shown by the physician's report and sought the following: (1) an adjudication that respondent was a disabled person; (2) its appointment "as limited guardian of the person and plenary guardian of the estate, *** with the power to give medical consents [and] enter into contracts on behalf of the ward"; (3) the limited guardian of the person be granted the power to admit the ward to an appropriate residential facility without further court order; and (4) for such other relief as the court may deem just and equitable.

The only medical evidence presented during the hearings on the petitions concerning the wards' disabilities was the reports of Dr. Ingalsbe (their physician at Elmwood Manor) and testimony by caseworkers and the managing administrator of OSG. The guardian *ad litem* (GAL) appointed by the court waived the appearance of each of the wards and Dr. Ingalsbe. Each of Dr. Ingalsbe's reports listed the following for each ward: (1) a March 11, 1992, examination of the ward, (2) the medical or psychiatric diagnosis, (3) a recommended living arrangement providing 24-hour supervision for the ward, and (4) a recommended appointment of a limited guardian. None of Dr. Ingalsbe's reports indicated the type or duration of medication prescribed for the wards. Instead, caseworkers from OSG testified to the type of psychotropic medication prescribed by Dr. Ingalsbe for 12 wards (two wards were not receiving psychotropic medication). OSG presented no evidence regarding the intended effect of the medication, how the medication would ameliorate the symptoms in each ward's diagnosis, or any alternatives to continued medication.

On May 19, 1992, the trial court entered orders appointing OSG as limited guardian of the person and estate for 10 of the wards, and family members as guardians for the remaining four. All of the orders stated that no physical or "chemical restraint" was authorized beyond the expiration of a 30-day period following the last date psychotropic medicine had already been prescribed for the wards. The orders also denied the guardian the power to make the decision to forego life-sustaining treatment pursuant to the Health Care Surrogate Act (Surrogate Act) (Ill. Rev. Stat. 1991, ch. 110½, par. 851—1 *et seq.*) and limited the guardian's authority to make residential placement of the respondent to a shelter care or higher level of care facility.

OSG then filed a motion for reconsideration alleging that (1) the trial court failed to distinguish between "chemical restraint" and "psychotropic medication" and should have granted the guardians authority to consent to the administration of psychotropic medication; (2) the guardians should not have been denied the authority on behalf of the ward to forego life-sustaining treatment pursuant to the Surro-

gate Act; (3) the court erred in limiting the guardians' authority to make residential placement decisions; and (4) the court erred in appointing guardians of the estate for each ward.

On July 7, 1992, the court entered subsequent guardianship orders for each of the 14 wards. Those orders contained the following provisions:

> "That the Limited Guardian shall have the following powers or limitations upon powers:
>
> 1. To execute medical consents.
>
> 2. To enter into contracts.
>
> 3. To release necessary information.
>
> 4. To authorize direct payment of Social Security or other governmental benefit income to such care facilities as are hereunder authorized.
>
> 5. No physical or chemical restraint is authorized other than what was then in use *and approved* at the time of the hearing on the Petition.
>
> 6. To authorize emergency use of physical or chemical restraint for up to 30 days without further Court order on the condition that such restraint, of any length, is promptly submitted for Court approval.
>
> 7. No power is granted to make a decision to forgo life-sustaining treatment without further application and notice to the Court and the Guardian ad Litem. Such application will be scheduled and heard on an emergency basis if requested.
>
> 8. To make residential placement of the Respondent in a matter [*sic*] that maximizes the Respondent's self-reliance.
>
> __X__ (Also applicable if checked) In view of the evidence regarding medication required for the treatment and/or restraint of the Respondent, residential placement shall consist of at least Shelter Care or a higher level of care." (Emphasis in original.)

We note that in case Nos. 92—P—35 and 92—P—37, the wards were not receiving psychotropic medication, and residential placement was not limited to a shelter care or higher level of care. OSG appeals on behalf of all 14 wards, raising the same issues as in its motions for reconsideration relating to the limits imposed on the guardians' decision-making authority and challenging the appointment of guardians of the estates.

## II. STANDING TO APPEAL

 We initially note that OSG was appointed limited guardian of

the person and estate in only 10 of the 14 cases which it purports to appeal. In the other four cases, the court appointed family members limited guardians of the person and estate (regarding respondents Evyonne Beenders (case No. 92—P—25), Mary Cady (case No. 92—P—26), Sharlene Donaldson (case No. 92—P—27), and Jeanette Hitchcock (case No. 92—P—31)). We hold that OSG lacks standing to pursue an appeal in these four cases. The guardianship orders in those cases do not affect OSG. A party can only appeal from judgments or orders of the circuit court by which he has been aggrieved. (See *Gordon v. Gordon* (1955), 6 Ill. 2d 572, 574, 129 N.E.2d 706, 708; *In re East Lake Fork Special Drainage District* (1985), 137 Ill. App. 3d 473, 476, 484 N.E.2d 507, 509.) We therefore dismiss the appeal as to the guardianship orders naming family members as limited guardian of the person and estate.

### III. CHEMICAL RESTRAINT LIMITATION

■ OSG initially argues that the trial court failed to distinguish "chemical restraint" from psychotropic medication and thereby erred in limiting OSG's authority to consent to medical treatment for the wards utilizing psychotropic drugs as authorized by the wards' physician. The court ordered the wards transferred to shelter-care facilities under the Nursing Home Care Act. (Ill. Rev. Stat. 1991, ch. 111½, par. 4151—101 *et seq.*) Regulations promulgated pursuant to the Nursing Home Care Act prohibit the use of pharmaceuticals for the purpose of patient restraint:

> "No chemical, medication or tranquilizer shall be employed by a facility as a restraint or confinement in lieu of or in addition to any physical restraint or confinement. Such chemicals, medications or tranquilizers may only be employed as part of a duly prescribed therapeutic medical treatment program authorized by the resident's physician and documented in the resident's clinical record." 77 Ill. Adm. Code §330.4230(c) (1991).

A review of the record indicates that the trial court, in utilizing the term "chemical restraint" when referring to prescribed medication, was concerned with the *lack of evidence* that the psychotropic medication administered to the wards was necessary to therapeutically treat their psychiatric conditions, not merely to restrain their behavior. While caseworkers from OSG testified about the type and dosage of psychotropic drugs currently prescribed for the wards, the court found that the caseworkers were not qualified to establish whether the purpose was therapeutic treatment or personal restraint. The court did not hold that the mere use of such medication necessar-

ily constitutes restraint. Rather, the court's prohibition on "chemical restraint" here was based on the fact that no proper medical evidence was presented establishing the need and purpose for using psychotropic drugs with these wards.

Antipsychotic or psychotropic drugs are medications commonly used in treating mental disorders. (*Washington v. Harper* (1990), 494 U.S. 210, 214, 108 L. Ed. 2d 178, 193, 110 S. Ct. 1028, 1032.) "[T]he effect of these and similar drugs is to alter the chemical balance in the brain, the desired result being that the medication will assist the patient in organizing his or her thought processes and regaining a rational state of mind." (*Washington*, 494 U.S. at 214, 108 L. Ed. 2d at 193, 110 S. Ct. at 1032.) However, these drugs can also have serious, even fatal side effects. (See *Washington*, 494 U.S. at 230, 108 L. Ed. 2d at 203, 110 S. Ct. at 1041.) Further, regulations applicable to psychotropic drug treatment under the Mental Health and Developmental Disabilities Code (Code) (Ill. Rev. Stat. 1991, ch. 91½, par. 1—100 *et seq.*) provide that psychotropic drugs shall not be prescribed for periods exceeding 30 days. 59 Ill. Adm. Code §112.90(a)(5) (1991).

OSG argues that the trial court should not have limited its authority to consent to the administration of psychotropic medications because it is the role of the guardian, not the courts, to make decisions for a ward when her physician believes psychotropic medication is appropriate. In support of its position, OSG cites *In re Ingersoll* (1989), 188 Ill. App. 3d 364, 368, 544 N.E.2d 409, 412 (diagnoses and treatment of a mental health disorder is a highly specialized area of medicine better left to the experts who are the most knowledgeable sources of diagnoses, treatment and prognoses), and *In re Orr* (1988), 176 Ill. App. 3d 498, 509, 531 N.E.2d 64, 71-72 (the court exceeded the statutory authority of the Code by ordering the forced administration of psychotropic drugs to a person involuntarily committed to a mental health facility as the court's place in the treatment process was to review the plan periodically and monitor the person's progress when a guardian had not been appointed).

We find both *Ingersoll* and *Orr* distinguishable. In *Ingersoll*, the court focused on the sufficiency of the evidence to involuntarily admit the respondent to a mental health facility, not a guardian's authority to consent to psychotropic drug treatment. Similarly, *Orr* did not involve consent by a guardian. Furthermore, *Orr* was decided prior to the recently enacted section 2—107.1 of the Code, which provides a method of circumventing the refusal of psychotropic medication by court petition, hearing, and order. Relevant provisions of that section provide the following:

"Notwithstanding the provisions of Section 2—107 of this Act [allowing patient refusal of services and medication], psychotropic medication may be administered to a recipient of services against his will under the standards and procedures of this Section:

(a) Any person 18 years of age or older, including any guardian, may petition the circuit court for an order authorizing the administration of psychotropic medication to a recipient of services.

(b) The court shall hold a hearing within 30 days of the filing of the petition.

\*\*\*

(d) Psychotropic medication shall not be administered to the recipient unless it has been determined by clear and convincing evidence that all of the following factors are present:

(1) That the recipient has a serious mental illness or developmental disability.

(2) That because of said mental illness or developmental disability the recipient exhibits deterioration of his ability to function, suffering, or threatening or disruptive behavior.

(3) That the illness or disability has existed for a period marked by the continuing presence of the symptoms set forth in paragraph (2) of subsection (d) of this Section or the repeated episodic occurrence of these symptoms.

(4) That the benefits of the psychotropic medication will outweigh the harm.

(5) That the recipient lacks the capacity to make a reasoned decision about the medication.

(6) That other less restrictive services have been explored and found inappropriate.

\* \* \*

(g) A guardian shall only be authorized to consent to the administration of psychotropic medication under the standards and procedures of this Section." (Ill. Rev. Stat. 1991, ch. 91½, par. 2—107.1.)

OSG argues that because none of the wards in these cases have refused psychotropic medication, section 2—107.1 of the Code does not limit its authority to consent to treatment of the wards with such medication.

In construing this provision we note that section 2—107.1 of the Code twice refers to guardian authorization of psychotropic medication. Section 2—107.1(a) of the Code provides that any person, "*in-*

*cluding any guardian*" (emphasis added), may file a petition to authorize the administration of psychotropic medication when a patient refuses treatment. (Ill. Rev. Stat. 1991, ch. 91½, par. 2—107.1(a).) Section 2—107.1(g) of the Code requires the guardian to use this procedure to obtain authorization to consent to the use of psychotropic drugs. At oral argument, counsel for OSG conceded that under its interpretation of the statute (namely, that it only applies when a ward refuses psychotropic drugs), section 2—107.1(g) becomes duplicative of section 2—107.1(a) and adds nothing to the guardian's obligation to seek a court order for psychotropic treatment unless the ward refuses consent. We refuse to attribute such redundancy to the legislature.

■ Statutes should be construed as a whole, with reasonable meaning attributed to every word, phrase, or section such that none are rendered superfluous or meaningless. (*Kraft, Inc. v. Edgar* (1990), 138 Ill. 2d 178, 189, 561 N.E.2d 656, 661; *In re Marriage of Freeman* (1985), 106 Ill. 2d 290, 297, 478 N.E.2d 326, 329.) In applying this rule to section 2—107.1, we conclude the plain meaning of section 2—107.1(g) requires a petition, hearing, and court order before a guardian can authorize the administration of psychotropic medication—even if the ward does not refuse consent.

As applied to the facts of this case, OSG needed to present proof by clear and convincing evidence of all the factors specified in section 2—107.1(d) of the Code, regardless of any ward's failure or inability to refuse psychotropic drug treatment. We do not view the court's role under this statutory scheme as an unwarranted intrusion into the area of therapeutic medical decisions made for psychiatric treatment. Instead, the court merely oversees the guardian's decision making to ensure that the guardian complies with the statutory protections of section 2—107.1 of the Code. In this case, the medical reports on each of the wards did not suffice as proof of all the factors required by section 2—107.1(d) of the Code. Because the trial court, therefore, had no basis on which to grant OSG authority to consent to psychotropic treatment under section 2—107.1 of the Code, it certainly did not err in limiting the use of chemical restraint without further proceedings.

We further note that section 11a—9 of the Probate Act of 1975 (Probate Act) (Ill. Rev. Stat. 1991, ch. 110½, par. 11a—9(a)) provides for the submission of a report when a petition for appointment of a guardian is filed. Such report must contain "(1) a description of the nature and type of the respondent's disability; (2) evaluations of the respondent's mental and physical condition ***; (3) an opinion as to whether guardianship is needed, the type and scope of the guardianship needed, and the reasons therefor; (4) a recommendation as to the

most suitable living arrangement and, *where appropriate, treatment or habilitation plan for the respondent and the reasons therefor*; [and] (5) the signatures of all persons who performed the evaluations upon which the report is based, one of whom shall be a licensed physician." (Emphasis added.) (Ill. Rev. Stat. 1991, ch. 110½, par. 11a—9(a).) We construe section 11a—9(a)(4) of the Probate Act to encompass the limiting provisions of section 2—107.1 of the Code as an "appropriate" component of the report where a guardian seeks judicial consent for treatment with psychotropic drugs.

Given that the legislature has expressly addressed the conditions under which a guardian may consent to treatment of a disabled person with psychotropic medication and the absence in this case of proof by clear and convincing evidence of the factors specified in section 2—107.1 of the Code, we cannot conclude the trial court's decision in limiting the use of chemical restraint of the wards was manifestly erroneous. (See *Orr*, 176 Ill. App. 3d at 505, 531 N.E.2d at 69.) As these were OSG's petitions, OSG bore the burden to present sufficient evidence that each respondent needed this medication, and it simply did not do so. The GAL's waiver of the physician's appearance did not fulfill the proof requirement or relieve OSG of its burden of proof. We conclude that the limitations stated in the court's July 1992 orders were within its discretion.

### IV. DENIAL OF POWER TO DECIDE TO FOREGO LIFE-SUSTAINING TREATMENT

OSG next argues the trial court abused its discretion in denying the guardian the authority to forego life-sustaining treatment of the wards pursuant to provisions of the Surrogate Act. OSG claims that the court had a duty to not "unduly limit" the guardian's exercise of judgment. OSG, citing provisions of the Illinois Power of Attorney Act (Ill. Rev. Stat. 1991, ch. 110½, par. 801—1 *et seq.*) and section 11a—17(d) of the Probate Act (Ill. Rev. Stat. 1991, ch. 110½, par. 11a—17(d)), contends that Illinois law and public policy "clearly favor" decision making on matters of health care without judicial intervention.

Assuming *arguendo* that the public policy urged by OSG may be culled from those provisions, OSG does not allege that any of the wards have executed a durable power of attorney designating OSG her agent so as to invoke provisions of the Illinois Power of Attorney Act, nor that section 11a—17(d) of the Probate Act mandates that OSG be given the power to act as a surrogate solely by virtue of its status as guardian. Therefore, the grant of authority that OSG seeks must be found, if at all, within the provisions of the Surrogate Act.

■ Section 20 of the Surrogate Act provides that decisions to forego life-sustaining treatment by a surrogate decision maker are lawful without resort to the courts when a person does not possess "decisional capacity" and suffers from a "qualifying condition." (Ill. Rev. Stat. 1991, ch. 110½, par. 851—20.) Section 10 of the Surrogate Act defines "decisional capacity" as "the ability to understand and appreciate the nature and consequences of a decision regarding forgoing life-sustaining treatment and the ability to reach and communicate an informed decision in the matter as determined by the attending physician." (Ill. Rev. Stat. 1991, ch. 110½, par. 851—10.) Moreover, "a diagnosis of mental illness or mental retardation, of itself, is not a bar to a determination of decisional capacity," and the attending and concurring physicians must make such determination to a reasonable degree of medical certainty and set forth the determination in the patient's medical records. (Ill. Rev. Stat. 1991, ch. 110½, par. 851—20(c).) Similarly, the attending and concurring physicians shall document the existence, cause, and nature of a "qualifying condition" in the patient's medical records. Ill. Rev. Stat. 1991, ch. 110½, par. 851—20(e).

In this case, no evidence of record exists that any of the wards are without "decisional capacity" and require a surrogate decision maker, or that they exhibit a "qualifying condition." Under such circumstances, each of the wards, *not* the guardian, retains the "fundamental right" to make decisions contemplated by the statute. (Ill. Rev. Stat. 1991, ch. 110½, par. 851—5(a).) We therefore conclude that the trial court did not abuse its discretion in limiting the authority of OSG as guardian of the wards by denying it the power to act as decision maker under the Surrogate Act. We note, however, that the provision in the court's July 1992 orders does not preclude OSG from initiating proceedings under the Surrogate Act, with notice and the presentation of proof.

## V. RESIDENTIAL PLACEMENT PROVISION

OSG next argues that the trial court erred in ordering residential placement of the wards in shelter care or a higher level of care because the guardian should have flexibility in making placement decisions. Paragraph 8 of the trial court's orders first directs the guardian to make residential placement in a manner that maximizes the respondent's self-reliance, and, second, regarding all but two of the wards (Nos. 92—P—35, 92—P—37), imposes the limitation on placement where evidence existed of medication requirements. OSG contends that the court erred in considering only the type of medication the wards received, instead of the obligation to encourage the maximum self-reliance and independence of the wards by allowing the

guardian the authority to select the least-restrictive environment appropriate. (See Ill. Rev. Stat. 1991, ch. 110½, par. 11a—3(b).) OSG does not contend that the shelter-care facilities ordered by the court are not the least-restrictive environment appropriate for any of the wards, nor does it demonstrate how shelter-care placement will impact the wards' self-reliance or independence.

The physician's reports for each ward recommend 24-hour supervision for the monitoring of medications or control of individual manifestations of the reported illness or both. The managing administrator for OSG testified that shelter care would better serve each ward than would an unlicensed room and board, although proximity to family was also a placement consideration. During the hearing on the petitions and in response to OSG's request, the court indicated that it would consider less restrictive living arrangements for each of the wards *upon proof* such placement would be beneficial. Other than noting that some of the wards had lived in a room and board setting for many years, OSG did not present such evidence.

■ Section 11a—14.1 of the Probate Act gives the court authority to specify the conditions under which the guardian may place a ward in a residential facility. (Ill. Rev. Stat. 1991, ch. 110½, par. 11a—14.1.) Because the evidence does not demonstrate that the placement ordered by the court is not necessitated by the wards' physical and mental limitations, we hold that the court did not abuse its discretion by limiting the placement options of the guardian.

### VI. Appointment As Guardian Of Estates Of Respondent Wards

OSG last argues that the trial court should not have appointed OSG as guardian of the estate because none of the wards had any estate to administer except social security benefits. Upon review of the records before us, we wonder why, then, did OSG petition to become plenary guardian of estate of each ward, alleging that none could manage her estate as shown by the physician's report appended to each petition? We note that the record contains no motion to strike that portion of the petitions which sought guardianship of the estate of each of the wards as required by section 11a—8 of the Probate Act. (Ill. Rev. Stat. 1991, ch. 110½, par. 11a—8.) The court indicated that it included an order for a guardian of the estate as well as a guardian of the person to protect any assets which any ward might acquire in the future. The court noted the guardian would incur a minimal additional burden when filing its report on placement location because the guardian would also need to include a confirmation that all social se-

curity funds had been used for the ward's upkeep or personal allowance.

On appeal, OSG now argues that because it or family members serving as guardian of the person or a representative payee for social security benefits can simply "assist" each ward with finances, the trial court's appointment of a guardian of the estate is against the manifest weight of the evidence. In contesting its appointment as guardian of the estates, OSG cites several cases in which proof of the incompetency of a person for whom guardianship was sought was at issue on appeal. (See *In re Estate of Mackey* (1980), 85 Ill. App. 3d 235, 406 N.E.2d 226; *In re Estate of Barr* (1986), 142 Ill. App. 3d 428, 491 N.E.2d 1241; *In re Estate of McPeak* (1977), 53 Ill. App. 3d 133, 368 N.E.2d 957.) Although OSG asserts that the trial court did not inquire into whether any of the wards would benefit by appointment of a guardian of the estate, the physician reports indicated that none of the wards could make her own financial decisions. Because the cases cited by OSG all involve an initial determination of incompetency, which is not contested here, they do not pertain to whether the circuit court abused its discretion in appointing a guardian of the estate when no current estate except social security benefits exists.

OSG next points out that under the circuit court's reasoning, every disabled person would need a guardian of both the person and the estate based solely on a speculative future estate generated from an unknown source, even though the Probate Act clearly envisions the appointment of a guardian of the person without appointment of a guardian of the estate (see Ill. Rev. Stat. 1991, ch. 110½, pars. 11a—3(a), 11a—12(b)).

The guardianship orders in this case state the following: "The Guardian shall make a report to the court as to the respondent's person and estate every three years *** confirming that all social security or other governmental income sources have been paid to a placement facility authorized by this Order and/or for personal allowance. An itemized account shall be made as to all other receipts and disbursements."

■ In view of the court's finding of a need to collect and account for funds which might in the future flow to a ward incapable of managing her financial affairs, as well as to ensure that social security benefits are applied to the placement facility in which the ward resides, we cannot conclude the court abused its discretion and will not disturb its finding or substitute our opinion. (See *In re Estate of*

*Galvin* (1983), 112 Ill. App. 3d 677, 682, 445 N.E.2d 1223, 1226.) If OSG is going to handle the money for the wards, it was absolutely appropriate to order it to provide an accounting as a corollary responsibility. See Ill. Rev. Stat. 1991, ch. 110½, par. 24—11(a).

### VII. CONCLUSION

For the reasons stated, we affirm the 10 guardianship orders naming OSG guardian of the person and estate of the wards.

Affirmed.

McCULLOUGH and LUND, JJ., concur.