656 N.E.2d 773 (1995)
275 Ill.App.3d 665
212 Ill.Dec. 176
In re the ESTATE OF Lucille AUSTWICK, a Disabled Person (Patrick T. Murphy, Cook County Public Guardian, Petitioner-Appellee,
v.
John B. Lower, Director, Legal Advocacy Service, Guardianship and Advocacy Commission, Respondent-Appellant).
No. 1-94-0885.
Appellate Court of Illinois, First District, Fourth Division.
September 7, 1995.
*775 Legal Advocacy Service, Guardianship and Advocacy Com'n, Chicago (Ellen Holden Clark, Barbara J. Sosin, Laurel Whitehouse Spahn, of counsel), for appellant.
Patrick T. Murphy, Public Guardian of Cook County, Chicago, for appellee.
Justice SHEILA M. O'BRIEN delivered the opinion of the court:
The Cook County Public Guardian (hereinafter Public Guardian) appeals from the trial court's order removing a Do Not Resuscitate Order (DNR) from the medical chart of the Public Guardian's ward, Lucille Austwick. Mrs. Austwick cross-appeals from the trial court's order denying her petition to remove the Public Guardian for cause. We affirm.
On October 18, 1991, the probate court adjudicated 81-year-old Lucille Austwick a disabled person (Ill.Rev.Stat.1991, ch. 110½, par. 11a-1 et seq. (now 755 ILCS 5/11a-1 et seq. (West 1992))) and appointed the Public Guardian as plenary guardian of Mrs. Austwick's person and estate. In July 1992, Mark Broaddus, an attorney employed by the Public Guardian, visited Mrs. Austwick at her nursing home and asked whether she wanted a DNR in her medical chart. Broaddus explained to Mrs. Austwick the DNR would direct nursing home staff not to administer artificial ventilation, endotracheal intubation, closed chest cardiac massage, and emergency paramedic resuscitation. Mrs. Austwick stated she wanted the DNR. On January 7, 1993, the Public Guardian gave his consent to Mrs. Austwick's attending physician to place the DNR in Mrs. Austwick's nursing home medical chart.
On January 14, 1994, Mrs. Austwick, through the Legal Advocacy Service of the Illinois Guardianship and Advocacy Commission, petitioned the probate court to terminate the DNR. She also requested the removal of the Public Guardian as her plenary guardian because he failed to comply with the procedures set forth in the Health Care Surrogate Act (HCSA) (Ill.Rev.Stat.1991, ch. 110½, par. 851-1 et seq. (now 755 ILCS 40/1 et seq. (West 1992))) when consenting to the DNR. Under the HCSA, an adult patient who is able to make and communicate an informed decision to forgo life-sustaining treatment may do so without judicial involvement. (See Ill.Rev.Stat.1991, ch. 110½, par. 851-5(b) (now 40/5(b) (West 1992)).) When a person lacks such "decisional capacity" and suffers from a "qualifying condition", that is, a "terminal condition", "permanent unconsciousness", or "irreversible condition", (Ill. Rev.Stat.1991, ch. 110½, par. 851-10 (now 755 ILCS 40/10 (West 1992))) the HCSA authorizes a surrogate decision maker to decide whether to forgo life-sustaining treatment on that person's behalf. (Ill.Rev.Stat.1991, ch. 110½, par. 851-20 (now 755 ILCS 40/20 (West 1992)).) Mrs. Austwick argued she did not lack decisional capacity or have a qualifying condition, and therefore the Public Guardian had no authority to consent to a DNR for her.
Mrs. Austwick also argued for the removal of the Public Guardian because he had authorized the administration of psychotropic medication for her without court approval. Mrs. Austwick cited In re Guardianship of Austin (1993), 245 Ill.App.3d 1042, 185 Ill.Dec. 852, 615 N.E.2d 411, which held that section 2-107.1 of the Mental Health and Developmental Disabilities Code requires a petition, hearing, and court order before a guardian can authorize psychotropic medication.
Finally, Mrs. Austwick contended the Public Guardian should be removed because he *776 violated the "ethical standards of guardianship" when he consented to the DNR and authorized psychotropic medication for her.
At the hearing on the petition, Mark Broaddus testified about his conversation with Mrs. Austwick in July 1992 when she told him she wanted the DNR. Broaddus also testified that on January 17, 1994, three days after Mrs. Austwick filed her petition to terminate the DNR and remove the Public Guardian, he again spoke with Mrs. Austwick and she told him she still desired the DNR. Broaddus believed Mrs. Austwick had decisional capacity during both conversations.
Dr. Steven Fox, an expert in geriatric medicine, testified he had reviewed Mrs. Austwick's medical records and found no physician's statement saying she lacked decisional capacity. However, Dr. Fox noted since Mrs. Austwick had been adjudicated disabled under the Probate Act, "that's [an] indication * * * capacity is lacking somewhere." Dr. Fox also determined Mrs. Austwick was not suffering from one of the qualifying conditions as defined in the HCSA.
Mrs. Austwick's sister, Geraldine Champlain, testified in her evidence deposition that Mrs. Austwick stated prior to her adjudication as a disabled adult she would not want to be kept alive by machines. However, Mrs. Champlain testified Mrs. Austwick might not object to closed chest cardiac massage, one of the procedures prohibited under the DNR. Mrs. Austwick did not testify at the hearing.
The trial court ordered the DNR be removed. After hearing testimony that Mrs. Austwick's medical records did not indicate psychotropic medication had been administered against her will, the trial court denied her petition to remove the Public Guardian.
On appeal, the Public Guardian argues (a) Mrs. Austwick had decisional capacity when she informed Broaddus in July 1992 and January 1994 she wanted the DNR, and (b) the HCSA authorized the Public Guardian to consent to the DNR for her. Therefore, the trial court erred when it ordered the removal of the DNR from Mrs. Austwick's medical chart.
Under the HCSA, a person is presumed to have decisional capacity unless her attending physician states otherwise in writing and one other physician concurs. (Ill. Rev.Stat.1991, ch. 110½, par. 851-20(c) (now 755 ILCS 40/20(c) (West 1992)).) There are no such statements in Mrs. Austwick's medical records. However, Mrs. Austwick has been adjudicated disabled under the Probate Act. The Act defines as disabled a person 18 years or older who lacks the ability to fully manage her person or estate. (Ill.Rev.Stat. 1991, ch. 110½, par. 11a-2 (now 755 ILCS 5/11a-2 (West 1992)).) Dr. Fox concluded because Mrs. Austwick was disabled under the Probate Act she must lack decisional capacity. We disagree. Although a petition for adjudication of disability must be accompanied by a doctor's evaluation of the patient's mental and physical condition (see Ill. Rev.Stat.1991, ch. 110½, par. 11a-9 (now 755 ILCS 5/11a-9 (West 1992))), the doctor is not required to determine the patient's decisional capacity. Nor is a concurring determination of the patient's condition required. Thus, the adjudication of Mrs. Austwick as a disabled person under the Probate Act, of itself, does not overcome the presumption under the HCSA that she has decisional capacity.
However, we do not agree with the Public Guardian that the HCSA authorized him to give his consent to Mrs. Austwick's attending physician to place the DNR in her nursing home medical chart. The HCSA authorizes a surrogate decision maker to forgo life-sustaining treatment for a patient only when the patient lacks decisional capacity and has a qualifying condition. (See Ill.Rev. Stat.1991, ch. 110½, pars. 851-5(b), 851-20(b) (now 755 ILCS 40/5(b), 40/20(b) (West 1992)).) Where, as here, the patient has decisional capacity, she must herself give consent to the appropriate medical personnel to forgo life-sustaining treatment.
The Public Guardian cites In re Estate of Longeway (1989), 133 Ill.2d 33, 139 Ill.Dec. 780, 549 N.E.2d 292, and In re Estate of Greenspan (1990), 137 Ill.2d 1, 146 Ill.Dec. 860, 558 N.E.2d 1194, both decided prior to the enactment of the HCSA, in which our supreme court found a right to refuse life-sustaining treatment in our State's common law and in provisions of the Probate Act. The court held a surrogate can exercise the *777 right for a patient only if: (1) the patient is terminally ill as defined in section 2(h) of the Illinois Living Will Act; (2) the patient has been diagnosed as irreversibly comatose or in a persistently vegetative state; (3) the patient's attending physician and at least two other consulting physicians have concurred in the diagnosis; (4) the patient's right outweighs any interests of the State; (5) it is ascertained what the patient would have decided; (6) a court enters an order allowing the surrogate to exercise the patient's right to refuse treatment. Longeway, 133 Ill.2d at 47-53, 139 Ill.Dec. 780, 549 N.E.2d 292; Greenspan, 137 Ill.2d at 16, 146 Ill.Dec. 860, 558 N.E.2d 1194.
In this case, Mrs. Austwick is not terminally ill, irreversibly comatose, or in a persistently vegetative state, nor did the Public Guardian consent to the DNR pursuant to a court order. Thus, Longeway and Greenspan provide no support for the argument that the Public Guardian could consent to the DNR on Mrs. Austwick's behalf.
The Public Guardian also cites Cruzan v. Director, Missouri Department of Health (1990), 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224, in which the United States Supreme Court found a constitutionally protected liberty interest in refusing unwanted medical treatment. Nancy Cruzan was in a persistent vegetative state evincing no indications of significant cognitive function. (Cruzan, 497 U.S. at 265, 110 S.Ct. at 2845, 111 L.Ed.2d at 234.) Lester and Joyce Cruzan, Nancy's parents and coguardians, sought a court order directing the withdrawal of their daughter's artificial feeding and hydration equipment. (Cruzan, 497 U.S. at 268, 110 S.Ct. at 2846, 111 L.Ed.2d at 235.) The Missouri Supreme Court held Nancy's parents lacked authority to effectuate such a request because there was no clear and convincing evidence of Nancy's desire to have life-sustaining treatment withdrawn under such circumstances. (Cruzan, 497 U.S. at 268-69, 110 S.Ct. at 2846, 111 L.Ed.2d at 236.) The United States Supreme Court affirmed, holding Missouri could properly require a clear and convincing evidence standard in proceedings where a guardian seeks to discontinue nutrition and hydration of a person diagnosed to be in a persistent vegetative state. Cruzan, 497 U.S. at 284, 110 S.Ct. at 2854, 111 L.Ed.2d at 245-46.
Mrs. Austwick is not in a persistent vegetative state or otherwise unable to make her own decision regarding whether to forgo life-sustaining treatment, and therefore Cruzan is not applicable here. In sum, we hold the Public Guardian had no authority to consent to a DNR on Mrs. Austwick's behalf, and therefore the trial court did not err in removing the DNR from Mrs. Austwick's medical chart.
Next, we address Mrs. Austwick's cross-appeal from the trial court's order denying her petition to remove the Public Guardian for "good cause" under Section 23-2(a)(10) of the Probate Act. (Ill.Rev.Stat. 1991, ch. 110½, par. 23-2(a)(10) (now 755 ILCS 5/23-2(a)(10) (West 1992)).) Mrs. Austwick argues the trial court did not follow proper procedures prior to denying her petition. Section 23-3 of the Probate Act provides that after the filing of the petition
"the court shall order a citation to issue directing the respondent to show cause why he should not be removed for the cause stated in the citation. The citation must be served not less than 10 days before the return date designated in the citation and must be served and returned in the manner provided for summons in civil cases." (Ill.Rev.Stat.1991, ch. 110½, par. 23-3 (now 755 ILCS 5/23-3 (West 1992)).)
Mrs. Austwick complains the trial court failed to issue a citation directing the Public Guardian to show cause why he should not be removed. Instead, the trial court required Mrs. Austwick to prove why a citation should issue.
The purpose of the citation is to notify the respondent about the alleged causes for removal and to give him an opportunity to defend at a hearing. The petitioner bears the burden at the hearing of introducing evidence establishing reasonable grounds for removal. (In re Estate of Kirk (1993), 242 Ill.App.3d 68, 73, 183 Ill.Dec. 274, 611 N.E.2d 537.) If the petitioner meets her burden, the respondent then must prove his *778 fitness to retain office. Kirk, 242 Ill.App.3d at 73, 183 Ill.Dec. 274, 611 N.E.2d 537.
Although the trial court in this case never issued a citation, the Public Guardian was notified and personally appeared at a hearing in which Mrs. Austwick presented evidence in support of her grounds for removal. The Public Guardian responded with evidence as to why he should not be removed, and the trial court denied the petition. We find these procedures substantially sufficient to ensure compliance with the intent and purpose of the Probate Act. See In re Estate of Denaro (1983), 112 Ill.App.3d 872, 68 Ill.Dec. 455, 445 N.E.2d 1308 (substantial compliance with section 23-3 is sufficient).
Next, Mrs. Austwick argues the trial court erred when it denied her petition to remove the Public Guardian for "good cause." Good cause for removal under section 23-2(a)(10) of the Probate Act generally arises from malfeasance by or inability of the guardian. (See In re Estate of Brown (1982), 103 Ill. App.3d 470, 59 Ill.Dec. 172, 431 N.E.2d 457.) In certain situations good cause for removal exists even if a guardian has acted properly. However, those exceptions are not applicable here. (See In re Estate of Wadman (1982), 110 Ill.App.3d 302, 66 Ill.Dec. 61, 442 N.E.2d 333 (section 23-2(a)(10) used to return a child to the custody of a parent when that parent had become a fit parent, even though the previously appointed guardian had served properly and continued to be able to do so); In re Estate of Debevec (1990), 195 Ill.App.3d 891, 142 Ill.Dec. 302, 552 N.E.2d 1043 (section 23-2(a)(10) used to remove public guardian so the ward's sister could be appointed guardian). The standard of review for removal of a guardian under section 23-2 is whether the trial court's decision is against the manifest weight of the evidence. Debevec, 195 Ill.App.3d at 897, 142 Ill.Dec. 302, 552 N.E.2d 1043.
Mrs. Austwick first contends the Public Guardian should be removed for good cause because he improperly consented to the DNR for her. We disagree. At the hearing on Mrs. Austwick's removal petition, the Public Guardian presented evidence he consented to the DNR because (a) Mrs. Austwick stated she wanted it; (b) he believed it was in Mrs. Austwick's best interest to effectuate her wishes; and (c) he thought the HCSA authorized him to give his consent on Mrs. Austwick's behalf. Although the Public Guardian misinterpreted the HCSA, and in fact he has no authority to consent to a DNR for Mrs. Austwick while she retains decisional capacity, there is no indication his error was anything other than a well-intentioned mistake that will not be repeated. Under these circumstances, the trial court's finding that the Public Guardian's consent to the DNR did not constitute "good cause" sufficient to remove him as Mrs. Austwick's plenary guardian was not against the manifest weight of the evidence.
Second, Mrs. Austwick argues the Public Guardian should be removed for good cause because he authorized the administration of psychotropic drugs for her on January 7, 1993, without seeking court approval pursuant to section 2-107.1 of the Mental Health and Developmental Disabilities Code. Section 2-107.1 in effect January 7, 1993, provided in relevant part:
"[P]sychotropic medication may be administered to a recipient of services against his will under the standards and procedures of this Section:
(a) Any person 18 years of age or older, including any guardian, may petition the circuit court for an order authorizing the administration of psychotropic medication to a recipient of services.
(b) The court shall hold a hearing within 30 days of the filing of the petition.
* * * * * *
(d) Psychotropic medication shall not be administered to the recipient unless it has been determined by clear and convincing evidence that all of the following factors are present:
(1) That the recipient has a serious mental illness or developmental disability.
(2) That because of said mental illness or developmental disability, the recipient exhibits deterioration of his ability to function, suffering, or threatening or disruptive behavior.

*779 (3) That the illness or disability has existed for a period marked by the continuing presence of the symptoms set forth in paragraph (2) of subsection (d) of this Section or the repeated episodic occurrence of these symptoms.
(4) That the benefits of the psychotropic medication will outweigh the harm.
(5) That the recipient lacks the capacity to make a reasoned decision about the medication.
(6) That other less restrictive services have been explored and found inappropriate.
* * * * * *
(g) A guardian shall only be authorized to consent to the administration of psychotropic medication under the standards and procedures of this Section." Ill.Rev.Stat. 1991, ch. 91½, par. 2-107.1, (now 405 ILCS 5/2-107.1 (West 1992)).
The Public Guardian interpreted section 2-107.1 then in effect as requiring court approval only if he sought to authorize psychotropic medication against Mrs. Austwick's will. Since Mrs. Austwick did not refuse consent, the Public Guardian did not go to court before authorizing the administration of psychotropic medication for her. However, in In re Guardianship of Austin, 245 Ill.App.3d at 1049-50, 185 Ill.Dec. 852, 615 N.E.2d 411, the Fourth District of the Illinois Appellate Court held section 2-107.1(g) then in effect required a petition, hearing, and court order before the guardian can authorize psychotropic medication, even where, as here, the ward does not refuse consent. Thus, the Public Guardian technically violated Austin when he authorized psychotropic medication for Mrs. Austwick without seeking prior court approval. As with the Public Guardian's consent to the DNR, though, there is no indication his authorization of psychotropic medication was anything other than a well-intentioned effort to act in Mrs. Austwick's best interests. Accordingly, the trial court's denial of Mrs. Austwick's petition to remove the Public Guardian for authorizing psychotropic medication without court approval was not against the manifest weight of the evidence.
Further, we note that effective March 31, 1995, Public Act 89-11 amended section 2-107.1 to provide that "[a] guardian may be authorized to consent to the administration of psychotropic medication to an objecting recipient only under the standards and procedures of [amended section 2-107.1]. * * * Notwithstanding any other provision of this Section, a guardian may consent to the administration of psychotropic medication to a non-objecting recipient under Article XIa of the Probate Act of 1975." Thus, the legislature has effectively overruled Austin; as of March 31, 1995, a guardian must receive court approval for the authorization of psychotropic medication only when the ward refuses consent.
Finally, we reject Mrs. Austwick's last argument claiming the Public Guardian should be removed for good cause because he violated the "ethical standards of guardianship." The alleged ethical violations consist of the Public Guardian's consenting to the DNR and psychotropic medication, which we have already determined do not amount to sufficient "good cause" to warrant removal. Therefore, we affirm the trial court's order denying Mrs. Austwick's removal petition.
Affirmed.
HOFFMAN, P.J., and THEIS, J., concur.