656 N.E.2d 779 (1995)
275 Ill.App.3d 769
212 Ill.Dec. 182
In re the ESTATE OF Lucille AUSTWICK, a Disabled Person (Patrick T. Murphy, Cook County Public Guardian, Petitioner-Appellee,
v.
John B. Lower, Director, Legal Advocacy Service, Guardianship and Advocacy Commission, Respondent-Appellant).
No. 1-93-4431.
Appellate Court of Illinois, First District, Fourth Division.
September 7, 1995.
As Modified on Denial of Rehearing October 19, 1995.
*781 Legal Advocacy Service, Guardianship and Advocacy Commission, Chicago (Ellen Holden Clark, Barbara J. Sosin, Laurel Whitehouse Spahn, of counsel), for Appellant.
Patrick T. Murphy, Public Guardian, County of Cook, Chicago, for Appellee.

MODIFIED ON DENIAL OF REHEARING
Justice SHEILA M. O'BRIEN delivered the opinion of the court:
On November 30, 1993, the Cook County Public Guardian filed an emergency petition pursuant to section 2-110 of the Mental Health and Developmental Disabilities Code (405 ILCS 5/2-110 (West 1992)) seeking authorization to consent to electroconvulsive therapy (ECT) for his ward, 81-year-old Lucille Austwick. Following a hearing, the trial court granted the petition. Mrs. Austwick appeals, and we reverse.
The relevant facts of this case, as gleaned from the Public Guardian's emergency petition, are as follows. On October 18, 1991, the probate court appointed the Public Guardian as plenary guardian of Mrs. Austwick's person and estate. On November 10, 1993, Mrs. Austwick was voluntarily admitted to the Geriatric Psychiatric Unit of Rush Presbyterian St. Luke Hospital, where Doctors Lazarus and Nabatian diagnosed her as suffering chronic depression and dementia. Doctor Lazarus told the Public Guardian that as a result of her depression, Mrs. Austwick refused to accept medication, nutrition, and hydration. Doctors Lazarus and Nabatian recommended treating Mrs. Austwick with ECT, a procedure in which an electrical stimulus is used to induce a cerebral seizure. They also warned that continued delay in treating Mrs. Austwick's depression would endanger her life.
At the hearing on the petition, Doctor Nabatian testified Mrs. Austwick suffered from "major depression with psychotic feature [and] dementia with agitation." The characteristics of depression with psychotic feature are withdrawal from others, paranoia and suspicion, while the characteristics of dementia with agitation are forgetfulness, impairment of judgment, and inability to distinguish between right and wrong.
Doctor Nabatian initially testified that as a result of her illnesses, Mrs. Austwick refused to take food and medication and was unable to take care of herself. Therefore, he believed ECT was the most appropriate treatment for Mrs. Austwick, despite his further testimony of the possible side effects of ECT including fractures, memory loss, confusion, delirium, and, in rare cases, death.
Later, Doctor Nabatian contradicted his earlier testimony regarding Mrs. Austwick's condition by stating Mrs. Austwick "sometimes" ate her food and she never refused anti-depressant medication. As a result, her health was not at a critical stage. Doctor Nabatian also acknowledged "a lot" of medications existed that could be used to treat Mrs. Austwick, and according to his testimony, those medications have few risks compared *782 to the side effects associated with ECT. Further, when he asked Mrs. Austwick whether she wanted ECT, she refused, saying "I am wise enough to * * * make [the] decision for myself. I don't need anybody to make [the] decision for me." However, Doctor Nabatian testified Mrs. Austwick was unable to distinguish between right and wrong, and therefore she lacked the capacity to make an informed decision regarding whether to accept or refuse ECT.
Rachel Velez Smith, a social worker in the Public Guardian's office, testified that in 1992 or 1993 she spoke with some of Mrs. Austwick's family members, who said Mrs. Austwick had been an "active, popular lady" who led a "full, active life" prior to her illness. However, Ms. Velez Smith gave no testimony regarding whether Mrs. Austwick indicated prior to her illness that she would want ECT administered to her if the need arose.
The trial court granted the Public Guardian's petition, finding (a) Mrs. Austwick did not have the capacity to make an informed decision about whether to accept or reject ECT; (b) no evidence was presented that she ever indicated to anyone during a time prior to her mental illness whether she would or would not accept ECT treatment; (c) it was in her best interests that ECT be administered to her. The trial court ordered the Public Guardian to consent to a maximum of 12 ECT treatments.
Mrs. Austwick, through the Legal Advocacy Service of the Guardianship and Advocacy Commission, appealed from the trial court's order granting the Public Guardian's petition. Subsequent to the appeal, the parties stipulated Mrs. Austwick's condition had improved and her physicians no longer recommended ECT for her; therefore, the case is now moot. However, since Mrs. Austwick's case presents questions of first impression that are of substantial public interest and likely to recur, we issue the present opinion under the public interest exception to the mootness doctrine. See Bonaguro v. County Officers Electoral Board (1994), 158 Ill.2d 391, 395-96, 199 Ill.Dec. 659, 634 N.E.2d 712.
First, Mrs. Austwick argues that before the trial court can authorize the Public Guardian to consent to ECT for her under section 2-110 of the Mental Health Code, the Public Guardian must prove by clear and convincing evidence she lacked the capacity to decide for herself whether to accept or reject ECT. Mrs. Austwick contends the Public Guardian did not prove by clear and convincing evidence she lacked such decisional capacity, and therefore the trial court erred when it authorized the Public Guardian to consent to ECT on her behalf.
Section 2-110 states:
"No recipient of services shall be subjected to electro-convulsive therapy, or to any unusual, hazardous, or experimental services or psychosurgery, without his written and informed consent.
If the recipient is a minor or is under guardianship, such recipient's parent or guardian is authorized, only with the approval of the court, to provide informed consent for participation of the ward in any such services which the guardian deems to be in the best interests of the ward." (405 ILCS 5/2-110 (West 1992).)
Thus, section 2-110 provides (1) a patient must give written and informed consent prior to the administration of ECT, or (2) a guardian must seek court authorization to give such consent on behalf of his ward. However, section 2-110 is silent on whether, before the trial court can authorize a guardian to consent to ECT on behalf of his ward, the guardian first must prove the ward lacked the ability to decide for herself whether or not she wants such treatment.
Since the legislature's intent is not clear from the plain meaning of the statutory language, we may look for guidance from statutes that are part of the same comprehensive scheme and relate to the same subject matter. (Moscardini v. Neurosurg, S.C. (1994), 269 Ill.App.3d 329, 333-34, 206 Ill. Dec. 855, 645 N.E.2d 1377.) We look to section 2-107.1 of the Mental Health Code (Pub.Act 89-11, eff. March 31, 1995 (amending 405 ILCS 5/2-107.1 (West 1992))), which provides for the administration of psychotropic medication upon application to a court. Psychotropic medication, like ECT, is a *783 means of treating mental illness and has a profound effect on the thought processes of an individual and a possibility of severe and irreversible side effects. (See In re Orr (1988), 176 Ill.App.3d 498, 512, 125 Ill.Dec. 885, 531 N.E.2d 64 (side effects of psychotropic drugs include tardive dyskinesia, an involuntary movement of limbs, tongue, and mouth; drowsiness; dizziness; dry mouth; loss of sexual desire; apathy; depression; and bowel disfunctions)). Given the intrusive nature and potential side effects associated with both psychotropic drugs and ECT, we think sections 2-107.1 and 2-110, which regulate the administration of those two treatments, relate to the same general subject matter and may be construed with reference to each other to determine legislative intent.
Section 2-107.1 provides that the trial court may not authorize a guardian to consent to the administration of psychotropic medication for his ward unless the guardian proves by clear and convincing evidence the ward "lacks the capacity to make a reasoned decision about the medication." (Pub.Act 89-11, eff. March 31, 1995 (amending 405 ILCS 5/2-107.1 (West 1992)).) Reading section 2-107.1 consistently with section 2-110, we believe the legislature intends the same provision to apply when a guardian seeks authority to consent to ECT for his ward. Accordingly, we hold the trial court may not authorize a guardian to consent to the administration of ECT unless the guardian proves by clear and convincing evidence that the ward lacked the capacity to make a reasoned decision about whether to accept or reject such treatment.
However, we note the legislature has not indicated, in either section 2-107.1 or section 2-110, how a guardian should prove his ward lacked decisional capacity regarding the proposed medical treatment. For example, is the testimony of one doctor sufficient, or is a concurring determination also required? We invite the legislature to address this issue. Until it does so, the trial court has the discretion to determine whether the evidence presented clearly and convincingly shows the ward's lack of decisional capacity. We will not disturb the trial court's determination unless it is manifestly erroneous, meaning the error is clearly evident, plain, and indisputable. In re Jeffers (1992), 239 Ill.App.3d 29, 35, 179 Ill.Dec. 895, 606 N.E.2d 727.
The trial court in this case found the Public Guardian proved by clear and convincing evidence that Mrs. Austwick lacked the capacity to decide whether to accept or reject ECT. The court relied on the testimony of Doctor Nabatian, who stated that due to her dementia, Mrs. Austwick's judgment was impaired and she could not distinguish right and wrong. Doctor Nabatian also testified that as a result of her dementia Mrs. Austwick lacked the capacity to make a responsible decision regarding ECT. No contrary testimony was given, and therefore we cannot say the trial court's finding that Mrs. Austwick lacked decisional capacity regarding the proposed ECT treatments is manifestly erroneous.
We recognize that at first glance our holding may seem to conflict with a related case involving Mrs. Austwick in which we determined she does possess the capacity to decide whether to forgo life-sustaining treatment. (See In re Estate of Austwick (1st Dist., 1995), 275 Ill.App.3d 665, 212 Ill.Dec. 176, 656 N.E.2d 773.) However, in that case we were interpreting the Health Care Surrogate Act (HCSA), which states that a person is presumed to have decisional capacity to forgo life-sustaining treatment unless her attending physician states otherwise and one other physician concurs. (Ill.Rev.Stat.1991, ch. 110 1/2, par. 851-20(c) (now 755 ILCS 40/20(c) (West 1992)).) No such statements appear in Mrs. Austwick's medical records, and therefore we held that under the HCSA we must presume she has decisional capacity. Austwick, 275 Ill.App.3d 665, 212 Ill.Dec. 176, 656 N.E.2d 773.
In contrast, the ECT hearing was held pursuant to section 2-110 which, unlike the HCSA, does not provide that at least two doctors must state the patient lacks decisional capacity regarding ECT. Thus, the uncontradicted testimony of Doctor Nabatian was sufficient, even without a concurring determination, to support the trial court's finding *784 that Mrs. Austwick lacked the capacity to decide whether to accept or reject ECT.
Next, Mrs. Austwick argues that the trial court erred by granting the Public Guardian's petition although neither party presented evidence regarding her "substituted judgment", that is, the decision she would have made regarding ECT if she was competent to do so. The Public Guardian responds that section 2-110 only requires proof ECT was in Mrs. Austwick's best interest.
In analyzing this issue, we look to In re C.E. (1994), 161 Ill.2d 200, 204 Ill.Dec. 121, 641 N.E.2d 345, the most recent pronouncement by our supreme court regarding the substituted judgment and best interest tests. In C.E., the court considered which test applies when a guardian seeks authorization pursuant to section 2-107.1 for the involuntary administration of psychotropic medication.
Section 2-107.1 provides that forced administration of psychotropic medication is only authorized if the court finds clear and convincing evidence "the benefits of the psychotropic medication will outweigh the harm." (Pub.Act 89-11, eff. March 31, 1995 (amending 405 ILCS 5/2-107.1 (West 1992)).) Our supreme court in C.E. held section 2-107.1 "permits the court's consideration of the `substituted judgment' of the mental health recipient, and that the court respect the wishes expressed by the mental health patient when the patient was capable of making rational treatment decisions in his own behalf." C.E., 161 Ill.2d at 221, 204 Ill.Dec. 121, 641 N.E.2d 345.
In support of its holding, the supreme court cited the following commentary:
"The operative guideline [of the best interest approach] is `what a reasonable person would do if competent.' The more modern `substituted judgment' standard requires the proxy to inquiry into the values and preferences of the patient and attempt to make a decision as the patient would, were he competent.
The `best interests' approach has been criticized as depriving incompetent individuals of rights which are accorded others `by ignoring their uniqueness and imposing upon them the views of a hypothetical majority or `reasonable man.' Community consensus replaces what are otherwise uniquely personal decisions. * * *
The substituted judgment standard was developed in an attempt to afford respect to the personal values of the incompetent patient. However, in the many cases where clear evidence is lacking on how the incompetent patient would decide if competent, strict adherence to this doctrine converts it into a legal fiction. In these cases, the standard often camouflages the fact that the proxy is, in reality, making an independent decision for the incompetent individual.
The hybrid approach * * * for guiding proxy decision-making appears to strike an appropriate balance between respect for an incompetent patient's individualism and concern for his health and protection. The court should look to the patient's previously expressed preferences, values, and beliefs in an effort to exercise a substituted judgment. However, if clear and convincing evidence on this matter is lacking, as it often is, the decision should be based on [what a reasonable person would do if competent.]" Cichon, The Right to "Just Say No": A History and Analysis of the Right to Refuse Antipsychotic Drugs, 53 La. L.Rev. 283, 391-92 (1992).
The supreme court considered this interpretation of section 2-107.1 consistent with the reasoning set forth in In re Estate of Greenspan (1990), 137 Ill.2d 1, 146 Ill.Dec. 860, 558 N.E.2d 1194. In Greenspan, the court considered whether the Public Guardian could consent to the withdrawal of artificial feeding and hydration from a ward who was in a chronic vegetative state. The C.E. court considered the following remarks in Greenspan:
"Though a guardian's duty is to act in a ward's best interest, such a standard is necessarily general and must be adapted to particular circumstances. One such circumstance is a ward's wish to exercise common law, statutory, or constitutional rights, which may sometimes influence or even override a guardian's own perception of best interests. [Citations.] This tension *785 between a ward's legal rights of volition and a guardian's own judgment of the ward's best interests resembles the tension this court discerned in [In re Estate of] Longeway[, 133 Ill.2d 33, 139 Ill.Dec. 780, 549 N.E.2d 292] [citation] between the best-interests and substituted-judgment theories for deciding whether to discontinue an incompetent and terminally ill patient's artificial life support.
In Longeway, this court approved application of the substituted-judgment theory, which requires a surrogate decisionmaker to establish, as accurately as possible, what the patient would decide if competent. [Citation.] Ascertainment of what the patient would decide must be based on clear and convincing evidence of the patient's intent, derived either from a patient's explicit expressions of intent or from knowledge of the patient's personal value system. [Citation.]
If it is clearly and convincingly shown that [the ward's] wishes would be to withdraw artificial nutrition and hydration, and if the other established criteria for permitting such withdrawal are met, [the ward's] imputed choice cannot be governed by a determination of best interests by the public guardian * * * or anyone else. Otherwise, the substituted-judgment procedure would be vitiated by a best-interests guardianship standard, elevating other parties' assessments of the meaning and value of lifeor, at least, their assessments of what a reasonable individual would chooseover the affected individual's own common law right to refuse medical treatment. Accordingly, the public guardian is not prevented by a best-interests standard from seeking relief in accordance with [the ward's] wishes as determined by substituted-judgment procedure. [Citation.]" Greenspan, 137 Ill.2d at 17-18, 146 Ill.Dec. 860, 558 N.E.2d 1194.
Consistent with Greenspan's reasoning, the supreme court in C.E. held that in determining whether to authorize the administration of psychotropic drugs under section 2-107.1, the trial court should acquiesce to the wishes expressed by the mental health recipient when he possessed decisional capacity. (C.E., 161 Ill.2d at 223-24, 204 Ill.Dec. 121, 641 N.E.2d 345.) In those cases where no clear and convincing evidence exists as to the mental health recipient's views toward psychotropic drugs when he possessed decisional capacity, the court should be guided by what a reasonable person would want. C.E., 161 Ill.2d at 223-24, 204 Ill.Dec. 121, 641 N.E.2d 345.
The same analysis applies when the trial court determines whether to authorize the administration of ECT pursuant to section 2-110. Section 2-110 provides that the trial court may authorize the guardian to consent to ECT if it is in the patient's best interests. (405 ILCS 5/2-110 (West 1992).) In determining the patient's best interests, the court first should ascertain the patient's views toward ECT when she was capable of making a responsible decision regarding the treatment. In making this determination, the court must look to the patient's previously expressed preferences, values, and beliefs. If no clear and convincing evidence exists as to the patient's views toward ECT when she possessed decisional capacity, the court must decide based on an objective standard of what a reasonable person would prefer under the circumstances.
In this case, neither party presented evidence regarding Mrs. Austwick's views toward ECT when she possessed decisional capacity, and therefore the trial court properly inquired into whether, objectively, the administration of ECT was in her best interests. Relying primarily on the testimony of Doctor Nabatian, the trial court found it in Mrs. Austwick's best interests that a maximum of 12 ECT procedures be administered during a four-week period.
We do not agree with the trial court's finding. Doctor Nabatian testified ECT was in Mrs. Austwick's best interests because she refused to take food and medication. However, Doctor Nabatian later contradicted that testimony by stating Mrs. Austwick did not refuse food all the time, she never refused anti-depressant medication, and her health was not at a critical stage. Furthermore, Doctor Nabatian testified he could prescribe "a lot" of other medications that might help Mrs. Austwick's condition and, according to *786 his testimony, posed fewer risks than ECT. In light of this testimony, we find the trial court's determination that ECT was in Mrs. Austwick's best interests manifestly erroneous. Accordingly, we reverse the trial court's order granting the Public Guardian's petition to consent to ECT for Mrs. Austwick.
We are not holding that ECT may never be in a patient's best interests. Rather, we are holding that in this case, given the contradictory medical testimony regarding Mrs. Austwick's condition and the medical testimony regarding possible side effects and availability of less risky treatments for her, the trial court erred in determining that ECT was in Mrs. Austwick's best interests.
Mrs. Austwick also contends section 2-110 violates procedural due process because (1) it fails to require that the patient be given notice and an opportunity to be heard at the ECT hearing; (2) it fails to require counsel for the patient; (3) it does not provide that the court's findings of fact be contained in the record; and (4) it does not provide the patient with a verbatim transcript of the hearing. We need not address these issues since Mrs. Austwick did not raise them in the trial court. However, we note Mrs. Austwick received notice of and appeared at the ECT hearing with counsel. The court's findings of facts are contained in the record and a verbatim transcript of the ECT hearing exists. Therefore, Mrs. Austwick was not deprived of procedural due process.
Mrs. Austwick's final argument is since section 2-110 only provides that the trial court may authorize a guardian to give consent to ECT on behalf of his ward, the trial court exceeded its subject matter jurisdiction by ordering the Public Guardian to consent to 12 ECT treatments for her.
Subject matter jurisdiction is the power of the court to hear the type of case before it and to grant the particular relief requested. (In re Estate of Nelson (1993), 250 Ill.App.3d 282, 286, 190 Ill.Dec. 212, 621 N.E.2d 81.) Pursuant to section 11a-3 of the Probate Act (755 ILCS 5/11a-3 (West 1992)), the trial court had subject matter jurisdiction to adjudicate Mrs. Austwick a disabled person and appoint the Public Guardian as plenary guardian for her person and estate. However, the court was not divested of jurisdiction over Mrs. Austwick with the appointment of the Public Guardian. A guardian acts as the hand of the court and is at all times subject to its direction in the manner in which he provides for the care and support of the disabled person. (Nelson, 250 Ill. App.3d at 287, 190 Ill.Dec. 212, 621 N.E.2d 81.) Accordingly, section 11a-17 of the Probate Act, the statute outlining the duties of a guardian for a disabled person, states the guardian must comply with the court's orders providing for the ward's "support, care, comfort, health, education and maintenance." (755 ILCS 5/11a-17 (West 1992).) Thus, if a trial court determines that a ward should receive ECT under section 2-110, it has subject matter jurisdiction under section 11a-17 of the Probate Code to order the guardian's consent for the number of treatments necessary to help her condition. If the ward's condition improves before the completion of the treatments, the guardian should seek a court order terminating the remaining ECT procedures.
In sum, we reject Mrs. Austwick's argument the trial court exceeded its subject matter jurisdiction in this case. However, we reverse the court's order because its finding that ECT was in Mrs. Austwick's best interests was manifestly erroneous.
Reversed.
HOFFMAN, P.J., and THEIS, J., concur.